[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. NATURE AND HISTORY OF PROCEEDINGS
This case concerns Mark C. (born March 31, 1983) and Amy C. (born July 2, 1984), who are the subjects of a petition filed on December 17, 1990 to terminate the parental rights of Mary C., their mother, Robert F., their father. On May 3, 1991, this court terminated Father's parental rights as to both children, based upon his voluntary consent to such termination. The petition against Mother alleged two statutory grounds for termination:
1. Conn. Gen. Statutes, Section 17a-112(b)(2)
 The parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time they could resume a responsible position in the life of the child.
2. Conn. Gen. Statutes, Section 17a-112(b)(3)
 The child has been denied by reason of an act or acts of parental commission of omission, the care, guidance or control necessary for his physical educational, moral or emotional well-being."
The petition also claimed that both grounds existed for not less than one year.
On January 8, 1991, Mother denied the allegations of the petition, and the case was tried on May 3, 6, and 9, 1991.
On December 16, 1986, the children were adjudicated as CT Page 7961 neglected as to Mother, and they were placed under an Order of Protective Supervision for six months. On June 16, 1987, Protective Supervision was extended to December 16, 1987. On December 1, 1987, the court ordered temporary custody to the Petitioner, and on January 26, 1988, the children were committed for a period not to exceed 18 months. On June 20, 1989 the commitment was extended for a period not to exceed 18 months, from July 26, 1989 to January 26, 1991. On December 11, 1990, a further extension was ordered, from January 26, 1991 to July 26, 1992.
During the trial of this case, which occurred on May 3, 6 and 9, 1991, the petitioner called the following witnesses; Susan Wax, DCYS Social Worker; Frank Anastasio, Mark's therapist at United Services, Inc.; Robin DeMarchi, present foster mother, Barbara Grover, Mother's therapist at Associates for Behavioral Change; Carol Chevalier, Amy's therapist at United Services, Inc.; Officer Dana Seymour and Officer Mark Kalinowski of the Norwich Police Department; Dr. Fernando Stern, court appointed psychiatrist; and Dr. Robert Meier, court appointed psychologist.
Mother called the following witnesses; Louise Rictchotte of the Mohegan Day Care Center; Joan Sears, a day-care provider at Bright Beginnings; James Crandall, maternal grandfather; and Barbara Thibault, live-in friend of James Crandall.
II. FACTS
Evidence offered at trial, interpreted in light of the prior record in this court concerning these children, of which the court has taken judicial notice, permits the finding of the following facts.
In April, 1986, Father threw 3-year old Mark off a couch, causing a laceration to his forehead which required treatment at Backus Hospital Emergency room, which has resulted in a sear. Less than a month later, Mark was back at the Backus Hospital because he was hit under the eye by a spatula thrown by Father at Mother. This caused a three inch laceration, also resulting in a sear. Mother falsely accepted the blame in criminal court for this incident, in order to shield Father from its legal consequences. She was placed on 2 years probation for this. On May 16, 1986, Mother voluntarily placed Mark with her Father, James Crandall, and his long time companion, Barbara Thibault. She kept Amy at home, but during the next several months frequently left her with various people for periods of several days to a week. Mark came home on August 27, 1986, shortly after Father went to jail; he remained jailed until March, 1987. At the end of the summer of 1986, CT Page 7962 the police were called to Mother's apartment several times because of disturbances. She was evicted from her apartment, so she and the children were provided with emergency housing at the Wauregan Hotel in January 1987. On December 16, 1986, the children were adjudicated as neglected in that they were permitted to live under conditions injurious to their well-being, and they were placed with Mother under Protective Supervision, and she signed a Service Agreement and Expectations (Pet's Exhibit 1 B) which covered the period of December 16, 1986 to June 16, 1987. Among other things, Mother agreed to find a new apartment and pay rent according to the lease, not to allow anyone in her apartment who causes a disturbance and will make conditions unsafe or unsuitable for children, will protect the children from abuse by anyone staying in her apartment, and will not permit the children to be in Father's presence when he is drinking. Mother did not comply with this Service Agreement and Expectations in that she was evicted from her apartment on January 12, 1987 for non-payment of rent; she went to emergency housing at the Wauregan Hotel. Following Father's release from jail on March 27, 1987, management and security at the hotel reported that much partying was going on in Mother's room, including loud music late into the night. Father was spending the night in Mother's room along with other young adults, in violation of hotel rules. Once, the manager entered the room and found several young adults in various stages of undress, rolling around on the beds in the presence of the children. Father was warned by the manager to stay out of Mother's room because of his disruptive behavior, and on April 10, 1987, he was arrested for Criminal Trespass. On April, 19, 1987, Mother, Father and children moved into a one bedroom apartment which was occupied by one or two adult males. The landlord said the family had no permission to move in. Shortly thereafter, neighbors complained of disruptive behavior late at night, requiring that police be called at least once. On May 12, 1987, both Mother and Father were arrested for Criminal Trespass at that apartment. Mother then moved again to the Wauregan Hotel, into a single room with minimal kitchen facilities. During this period the Visiting Nurse had to stop seeing the children, because she could no longer locate the family, nor did the family cooperate in efforts to provide a parent-aide. Also, in April and May, 1987, Mother didn't keep office appointments with DCYS, did not inform the department of her change in address, and was not home for scheduled visits.
On June 16, 1987, Protective Supervision was continued to December 16, 1987, with a revised Service Agreement and Expectations (Pet's Ex. 1C). These were not complied with in several respects, such as at least six moves in the six months, where they frequently didn't contribute to the rent, physical CT Page 7963 abuse of Mother by Father, and evidence of child abuse which resulted in DCYS obtaining an OTC on November 24, 1987. The children were placed with James Crandall and Barbara Thibault.
On January 26, 1988, the children were committed to DCYS and the parents signed a Service Agreement and Expectations for the period of January 26, 1988 to June 26, 1988 (Pet's Ex. 1D). Father was incarcerated again from March 31, 1988 until February 1989 for sale of controlled substances. During this period, while Father was in jail, Mother did quite well, to the point where the children were returned to her full time care in November 1988.
On July 26, 1988, Mother and Father (who was then in jail) signed a Service Agreement for the period July 26, 1988 to January 26, 1989 (Pet's Ex. 1E). Prior to Father's release from jail in February 1989, the Superior Court for Juvenile Matters on January 19, 1989, issued a Restraining Order, ordering him to have no contact with either child. On that date he signed a Service Agreement which described the treatment program he would have to follow before he would be allowed to rejoin his family. On February 9, 1989, Susan Wax of DCYS told him he would have to contact Barbara Grover of Associates for Behavioral Change for couples counseling with Mother, and Scott Stevens of Family Services Agency for group counseling for batterers. He did not contact either counselor nor receive comparable therapy anywhere else.
On April 14, 1989, Susan Wax discovered Mr. Forand in the home of Mother with the children present; she warned him that he was in violation of the court orders, and she made an appointment with him for the next day to review expectations. He did not keep that appointment.
On June 1, 1989, Susan Wax again found Father in the home with the children. A few days later, Mother was evicted from her home for non-payment of rent. On June 1, 1989, the children were taken from Mother and placed in foster care. On that date, Susan Wax again told Father that he needed to be in treatment for his problem of abusing Mother and the children, and she gave him an appointment for the next day to get the therapist's phone number. He did not keep the appointment. On June 6, 1989, he asked for, and was given the number, but he refused to sign a release of information form.
After the children were removed from Mother's home on June 1, 1989, Mark and Amy revealed that Father "would hit Mark and Amy on the butt and slap Mark in the face," that "Robert would lay on top of Mary, hold her hands down and hit her face," and that "Mommy would sometimes try to leave to call CT Page 7964 the police, but Robert wouldn't let her go." They also said that Robert occasionally would put the children in their room and close the door. "It was dark there and we had to stay there a long time while Robert smoked pot." According to the children, Father would hide in the shower or behind the bedroom door so that Susan Wax would not see him on certain of her home visits. In March, 1990, Amy told her foster Mother and her therapist that she had been sexually abused by Father while she was living in her Mother's home between February and June, 1989, when Father was under a court order to have no contact with the children. To confirm Amy's allegation, she was examined at the sexual abuse clinic at Yale-New Haven Hospital, where it was found that she had an "abnormal genital exam consistent with sexual abuse." Father was arrested on May 17, 1990 for sexual assault and Risk of Injury, and has been in jail since.
When the children were removed from Mother's care on June 1, 1989, because she was allowing Father to be in contact with Mark and Amy in violation of the court order, they were placed in a foster home in Preston. This placement lasted only two weeks because of Mark's behavior, so the children were placed in a foster home in New London, from which they had to be removed in five weeks, again because of Mark's behavior. They were then again placed in a maternal grandfather's home. This placement was terminated and the children placed in the DiMarchi foster home on August 22, 1989 because Mother told DCYS that her Father had sexually abused her as a child. She repeated this to Dr. Meier during a court ordered psychological evaluation (Pet's Ex. 5 Page 2).
Father was in jail again from August 17, 1989 to March 21, 1990. In May, 1990 he was arrested for Breach of Peace after a fight with another male in Mother's apartment. He admitted to the police that he had been drinking.
In August 1990, Mother started living with Paul Fluet. On November 11, 1990, while driving his car with one year old Robert, another of Mother's children, as a passenger, he fled the police at a high rate of speed as they were attempting to investigate the unregistered status of his car, and while trying to escape, crashed into another car, killing the driver and causing a broken leg and facial bruising to Robert. Mr. Fluet, age 21, was evaluated by Dr. Fernando Stern, a psychiatrist, on February 22, 1991, and on Page 9 of his report (Pet's Ex. 3), Dr. Stern stated: ". . . . ., I do not see him as the solution for the definite placement of Mark and Amy."
Robert D. Meier, Ph.D, a psychologist, did a court ordered evaluation of Mother and Father in October and November CT Page 7965 1986. In his report (Pet's Ex. 4), on Page 4, he stated on the last page under Conclusions and Recommendations. "It is also questionable whether she could take independent action to protect her children from harm from others . . . . . She must not only be taught a sense of responsibility for herself and her children, but needs to learn the basic behaviors and reactions necessary to protect these children. . . .
Unless these parents are willing and able to demonstrate involvement in the recommended programs and show greater cooperation with the appropriate agencies, it is possible these children will be subject to further abuse or neglect. There has been little evidence of such commitment by either parent and there is little indication based on the behavior of the parents that such change is likely in the near future."
Dr. Meier revaluated Mother and Father, and Mark and Amy in the Fall of 1989. In his report, (Pet's Ex. 5), with reference to Mark, he stated on Page 8 that "it is recommended that Mark continue with counseling and that his academic and personal behavior be followed carefully. Given his problems, a great deal of stability and security needs to be established in his home before being returned to Mother's care. There are serious questions whether this can be accomplished." As to Amy, he stated on Page 10 that "Amy is experiencing a moderate degree of anxiety, . . . has a strong attachment to her Mother . . . and given the proper environment should show a positive adjustment. On Page 11, Dr. Meier says "Both Mary and the children should continue in counseling. Mary must focus on her willingness and ability to make decisions regarding her own relationship with Robert Forand and her commitment to place the children's safety in highest priority. Given the present situation, it is recommended that the children have no contact with Robert Forand at this time until he has made a commitment to and has shown some progress in dealing with his behavior and substance abuse problems. It is also recommended that the children remain in placement until Mary Crandall is able to demonstrate greater ability to make use of supportive services and to protect the children in the future."
Pet's Ex. 1G is a September 7, 1990 letter from Barbara J. Grover, a mental health clinician from Associates for Behavioral Change, to DCYS, who had referred Mother there in January 1988 for counseling for parenting skills. She was last seen on May 15, 1990. This letter states that "throughout these 2 1/2 years Mary has at best been passively compliant with treatment. She knows the system well, says what is expected to be perceived as proper or appropriate, does what is asked of her, yet internalizes nothing and continues to CT Page 7966 place her children in jeopardy. Since I have known her, her commitment to Robert Forand has not swayed, despite her protests to the contrary. He, not her children, is her first priority. Though she has the knowledge and capacity to care appropriately for her children, she consistently uses poor judgement and keeps them at risk. She professes insight but lacks follow through. I feel this is unlikely to change given her history, borderline intellectual functioning and sociopathic nature."
In Pet's Ex. 1 H, a letter of September 27, 1990 to DCYS from Frank Anastasio, a clinician in the Parent Child Resource Center of United Services in Danielson, Mr. Anastasio stated that "Mark has been in therapy since October 26, 1989, attending weekly sessions consistently. Several sessions included his foster parents. Mark has made very good progress. . . . Especially early in treatment, he showed lack of trust in adults . . . His play was filled with anger, violence and confusion." Mr. Anastasio also testified that since about five or six months of therapy, Mark has dramatically improved, both in school and at his foster home, and that Mark has a great need for permanency, that he's been in limbo too long, has a difficult time attaching and trusting, is anxious about his future, needs a stable home and a home without violence, with structure and with guidance. Mr. Anastasio's letter (Pet's Ex. 1H) also states about Mark that "He would be particularly at risk if permanent placement was not secured. He is not the child who can sustain frequent changes in adult relationships and the adults in his life must have patience and perseverance."
Carol Chevalier, a clinician in the Parent Child Resource Center of United Services, testified that Amy had been in therapy since December 27, 1989, and had attended twenty-three sessions, including six which involved interviews with her foster parents. She testified that Amy's need for permanency and a stable environment is so great that "we should act yesterday", that it is very crucial and should be done immediately, that she has been traumatized by her several placements and that she is afraid to attach, and that Amy needs to feel safe and comfortable in a safe home with caring people.
Robin DiMarchi, foster Mother of both children since August 1989, testified that both children were very wild at first, and that both have made dramatic improvement.
Dr. Fernando Stern, who performed a psychiatric evaluation on Mother, Father, Mark, Amy, and Paul Fluet on February 22, 1991, testified that the children's need for permanency is immediate to prevent more damage, that both CT Page 7967 children are doing very well, that Mother does not have the capability to provide needed permanency for these two children now, and that there is no realistic hope that she will be able to in the foreseeable future. Dr. Stern also testified that Mother hasn't been able to protect the children and that the children know this and have lost trust in her, and that she has many personal needs that she places ahead of her children's needs. Dr. Stern stated that Mother's needs are so enormous they drown her ability to provide for the needs of her children, even though her relationship with her children is warm and pleasant, and they care for and love her. Dr. Stern also said that he recommends placement in a settled, stable environment as soon as possible, "yesterday" in fact. He said he believes Robert Forand will be a factor when he gets out of jail because Mother will not be able to resist him. He also testified that even with Paul Fluet as part of Mother's household, and with services to assist Mother in place, he still thinks her parental rights should be terminated, and that this should be done as soon as possible, that the children have been in Limbo long enough, and that termination of Mother's parental rights would be in the best interests of the children.
While Dr. Robert Meier was testifying, he stated in response to a hypothetical question that his opinion is that the children should be permanently placed away from their Mother and that this would be in their best interests.
It is undisputed that Mother has been faithful in visiting Mark and Amy over a long period of time and that she cares very much for them.
III. ADJUDICATIONS, ON FACTS AS OF DECEMBER 17, 1990 (date petition filed).
1. Failure to rehabilitate Conn. Gen. Stat. 17-a-112(b)(2)
This statutory ground requires the court to compare the children's situation with their Mother on December 16, 1986, the date on which they were adjudicated as neglected, to their situation with her on December 17, 1990, the adjudicatory date for the termination petition, and to determine whether the changes, if any, in Mother's capacity to care for them "would encourage the belief that within a reasonable time, considering the age and needs of the child(ren), they (she) could assume a responsible position in the life of the child(ren)."
Mother's capacity to responsibly care for both children at all pertinent times clearly pivoted around her relationship with Robert Forand. Mother was fully aware of this, and yet repeatedly and consistently was either unwilling or unable to CT Page 7968 protect the children from the ravages of Mr. Forand. When the children were adjudicated on December 16, 1986, the basis was that the children were permitted to live under conditions injurious to their well-being. For the period from that date until December 17, 1990, the date of the petition, the record is replete with further instances of the vicious cycle of Mr. Forand's commission of a crime, confinement in jail, and return to the children's home with Mother's active or passive acquiescence, once again to victimize the children. This, in spite of the fact that DCYS and Mother, with clock-like regularity, entered into Service Agreements which pinpointed this source of harm to the children, and contained her promises to do something about it (Pet's Exhibits 1B, 1C, 1D, and 1E). Even a Restraining Order, issued in this court in January 1989 ordering Father to have no contact with either child, was ignored by Mother. Within nine months Father was back in the house, sexually abusing Amy, and otherwise abusing both children.
As of May 15, 1990, about three and one-half years after the neglect adjudication, Barbara Grover, Mother's counselor since January 1988, said that in the two and one-half years that she has been seeing Mother "her commitment to Robert Forand has not swayed despite her protests to the contrary. He, not her children, is her first priority. I feel this is unlikely to change . . . ."
Mother has demonstrated time and again that, although she may love her children, when it comes right down to it, she will put herself first, even if it means that they will be harmed.
The long standing persistence of this indifference to the harm her children have been suffering and the record as a whole, clearly and convincingly establish that Mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, she could assume a responsible position in the life of the children, and that this ground has existed for not less than one year.
2. Acts of commission or omission. Conn. Gen. Stat. 17-a-112(b)(3)
 "The child has been denied by reason of an act or acts or parental commission or omission, the care guidance or control necessary for his physical, educational, moral or emotional well-being." CT Page 7969
This case is a textbook example of how a parent, by acts of omission, can deny her children the care necessary for their physical and emotional well-being. The court believes that Mary loves Mark and Amy, but unfortunately for her, and fortunately for them, that is not the issue. The issue is whether Mother has been vigilant in caring for her children, and if not, whether that lack of care has deprived them of the physical or emotional well-being that every child has a right to, a right that is objective and not ultimately related to a Mother's love or intent. In other words, this ground for termination could be found as to a Mother who loves her children, and be denied as to a Mother who, although not loving her children, has nonetheless, properly cared for them.
The record in this case shows repeated instances of abuse of Mark and Amy, both physical and sexual, from 1986 to 1990 by their Father. It is not necessary for the court to repeat the facts found and stated in part II of this Memorandum under FACTS; suffice it to say that Mary was fully aware of her need to protect Mark and Amy from Robert, yet was unwilling and or unable to do so. The contrast between the children's care when Robert was present and when he wasn't, is striking. Mother was presented with a clear-cut choice; Robert, or Mark and Amy; she consistently chose Robert, and she must now suffer the consequences of that choice. The court believes that continued attachment of Mark and Amy to their Mother means continued exposure to Robert, and to the ensuing terrible harm his presence represents. Mother has clearly demonstrated that she cannot protect Mark and Amy, although she has been given plenty of opportunity to do something about it. For whatever reasons, she is dominated by Robert, and this domination is of such a total and longstanding nature, that there is no basis for believing that Mother can break loose from it.
The court finds that the Petitioner has proved by clear and convincing evidence that Mark and Amy have been denied, by acts of Mary's omission, the care guidance or control necessary for their physical or emotional well-being, and that this ground existed for not less than one year prior to the filing of this petition.
IV. DISPOSITION: On facts as of May 9, 1991 (the final day of trial)
The court having determined that statutory grounds exist to terminate Mother's parental rights, must now consider whether it will be in the children's best interests to enter an order of termination based on facts existing as of the final day of trial, which in this case was May 9, 1991. In that regard the court is required to consider the six factors set CT Page 7970 forth in Conn. Gen. Statutes, Section 17a-112(d):
 1. The timeliness, nature and extent of services offered or provided to the parent and child by an agency to facilitate the reunion of the child with the parent.
DCYS (Susan Wax) prepared a Service Agreement for Mother's signature on December 16, 1986, containing sixteen specific elements of a program designed to "ensure that Mark and Amy Crandall are provided with a safe and stable environment." (Pet's Exhibit 1B), another Service Agreement signed on June 16, 1987, containing seventeen such elements (Pet's Ex 1C), three more similar Service Agreements, signed January 26, 1988, July 26, 1988 and January 10, 1989. (Pet's Exhibits 1D, 1E, 1F). DCYS also monitored Mother's counseling at Associates for Behavioral Change (Pet's Ex. 1G), Mark and Amy's therapy at United Services, Inc., (Pet's Exhibits 1H and 1I), and have supervised visitation and provided money regularly for these visits. Susan Wax drove Mary to some visits.
 2. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Mother complied with court orders to submit to psychological and psychiatric evaluations. Mother participated in Robert Forand's violation of a Restraining Order issued by this court on January 19, 1989.
 3. The feelings and emotional ties of the child with respect to his parent, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Foster Mother testified that the children never talk about returning to their Mother, although they are happy to see her, and that they only mention her on visitation day. Mother cars for the children and they care for and love her. The children are doing well and are content in their foster home.
4. The age of the children CT Page 7971 Mark was born on March 31, 1983 and Amy on July 2, 1984.
 5. The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including but not limited to:
 A. The extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications, or contributions and
 B. The maintenance of regular contact or communication with the guardian or the custodian of the child
Mary has maintained contact with the children, but has not changed her life enough to provide a safe home for the children.
 6. The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable act or conduct of the other parent of the child, or by the unreasonable act of any other person or by the economic circumstances of the parent.
There is no evidence that DCYS or any person other than Robert Forand interfered with Mother's relationship with the children. Robert Forand did interfere with it, but Mother is partially responsible for this, because she has not done what is necessary to enable herself to protect the children from him. DCYS did give Mother some financial assistance in visitation, was not related to any economic factors.
Dr. Fernando Stern, psychiatrist, believes that as to Mark, "his return to his original home or to his Mother is absolutely contraindicated, and prompt, secure and safe placement on a permanent basis is indicated." (Pet's Ex. 3, page 6). In the same exhibit on page 7, Dr. Stern stated that as to Amy, "prompt, secure and permanent placement away from Mr. Forand and Mary is recommended." These opinions arose out CT Page 7972 of Dr. Stern's evaluation of Mother and children on February 25, 1991.
Psychological testimony from professionals is rightly accorded great weight in termination proceedings In Re Nicolina T., 9 Conn. App. 598, 605 (1987).
Dr. Stern testified that the need for permanent placement for the children is immediate, that Mother doesn't have the capability to provide needed permanency for the children now, and there is no realistic hope that she'll be able to in the foreseeable future. He said Mother's needs are so enormous they drown her ability to provide for the needs of the children, and he recommended immediate placement in a settled, stable environment, because in the situation these children are in, even a few months are important. Dr. Stern also testified that Mark and Amy have already spent more time in foster care than the maximum recommended by general national Juvenile Justice standards, and that those general standards apply to this case, especially since there was an original placement, then return home, then placement again. Dr. Stern also said that the fact that Robert Forand's parental rights have been terminated does not change his opinion, because Mary's needs for approval and her dependence on others affects her ability to put her children's interests ahead of her own.
From the psychiatric evaluation and other evidence as identified above, it is clear that delaying any longer the identification of a safe, warm permanent home for these children would not be in their best interests, and it is further evident that the future holds no reasonable promise that Mother will be able to safeguard her children within a reasonable time, considering the time they have already been in foster care.
The court finds that by clear and convincing proof it has been established by the Petitioner that it is in the best interests of the children that Mother's parental rights be terminated, and they are hereby terminated.
It is ordered that the Commissioner of DCYS be appointed as statutory parent for the purpose of placing the children forthwith in adoption, and that the Commissioner file with this court no later than ninety days after the date of this judgment a written report as to the progress toward adoption.
V. APPEAL
Mother has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by her trial CT Page 7973 counsel of the court's judgment and her right to take an appeal, she affirmatively manifests her desire to do so, if her trial counsel is willing to act in that capacity, the court will appoint that attorney for this purpose. If the respondent manifests her desire to take an appeal and if her trial counsel declines to represent her because in his professional opinion it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the Mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the respondent Mother will be informed by the clerk forthwith that she has the balance of the extended time to appeal in which to secure her own counsel who, if qualified, may be appointed to represent her on the appeal. If she does not do so, then upon expiration of the extended appeal period, her right to pursue an appeal will be ended and the termination of her parental rights final. The children will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are even more appropriate where there are interests of a third party involved: Those of the children, whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise them is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks., supra, applies as much or more to cases where the persons affected by the judgment are young children for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Montville this 24th day of September 1991
Richard A. Walsh, Judge